UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELIZABETH SULLIVAN,

                    Plaintiff,

     v.

NATIONAL EXPRESS LLC
*and* DURHAM D&M LLC,

                  Defendants.

No. 21-CV-5789 (KMK)

OPINION & ORDER

---

Davida S. Perry, Esq.
Brian A. Heller, Esq.
Schwartz Perry & Heller LLP
New York, NY
*Counsel for Plaintiff*

Adam S. Gross, Esq.
Leo Ernst, Esq.
Jackson Lewis P.C.
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Elizabeth Sullivan ("Plaintiff") brings this Action against National Express LLC

("National Express") and Durham D&M LLC, ("Durham"; collectively, "Defendants"), alleging

disability discrimination under the New York Human Rights Law ("NYSHRL"), N.Y. Exec.

Law § 296.  (*See* Compl. (Dkt. No. 7).)  Before the Court is Defendants' Motion for Summary

Judgment.  (*See* Defs' Not. of Mot. (Dkt. No. 48).)  For the foregoing reasons, Defendants'

Motion for Summary Judgment is denied.

I.  Background

A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule

56.1, specifically Defendants' 56.1 Statement, (Defs.' Rule 56.1 Statement ("Defs' 56.1") (Dkt.

No. 49)), Plaintiff's Response to Defendants' 56.1 Statement, (Pl's Resp. to Defs' 56.1

Statement ("Pl's Resp. 56.1") (Dkt. No. 53)), and the admissible evidence submitted by the

Parties.  The facts are recounted "in the light most favorable to" Plaintiff, the non-movant.

*Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (quotation marks and citation

omitted).

1.  Plaintiff's Employment with National Express

Plaintiff began working for Defendants at National Express' Sparrow Bush location on

September 1, 2013.  (Defs' 56.1 ¶¶ 1, 4; Pl's Resp. 56.1 ¶¶ 1, 4.)  Initially, Plaintiff was hired as

a School Bus Monitor, but was promoted to School Bus Driver after obtaining her license in or

around September 2014.  (Defs' 56.1 ¶¶ 2–3; Pl's Resp. 56.1 ¶¶ 2–3.)

Defendants' job description for a School Bus Driver ("driver") required several skills to

carry out the position's function, which was to "provide safe and reliable transportation service

by operating various school buses in transporting pupils to and from school as well as related

activities." (Defs' 56.1 ¶ 6; Pl's Resp. 56.1 ¶ 6.)  For example, the position required that drivers

possess several skills, including meeting "physical and medical requirements," possessing the

ability to "lift and assist students when necessary," maintaining a "[h]igh degree of attention and

considerable dexterity in the control of the school bus/van," as well as "practic[ing] defensive

driving" and avoiding accidents while on the job.  (Defs' 56.1 ¶ 5; Pl's Resp. 56.1 ¶ 5.)  The

position also required drivers to have various physical skills to "[p]hysically assist[] passengers

in evacuation of the vehicle in case of emergency" and otherwise perform the job functions, such

2

as the ability to reach and operate emergency exits, adjust mirrors, retrieve fire extinguishers, and perform tasks requiring less than 25lbs of force.  (Defs' 56.1 ¶¶ 7–8; Pl's Resp. 56.1 ¶¶ 7–8.) "Plaintiff testified that the ability to be able to evacuate students in the event of an emergency was a component of the position."  (Defs' 56.1 ¶ 9; Pl's Resp. 56.1 ¶ 9; *see also* Defs' 56.1 ¶¶ 77, 96 (undisputed statements of witnesses regarding the need to evacuate students in the event of an emergency); Pl's 56.1 ¶¶ 77, 96 (same).)  Plaintiff was required to take and pass a physical performance test to be a driver for Defendants, though the Parties dispute who administered the test.  (Defs' 56.1 ¶¶ 10–11; Pl's Resp. 56.1 ¶¶ 10–11.)  "In order to pass the physical performance test, Plaintiff was required to drag 125 pounds over a distance of 30 feet in 30 seconds or less."  (Defs' 56.1 ¶ 12; Pl's Resp. 56.1 ¶ 12.)  Plaintiff took and passed the physical performance test at a minimum in 2014, 2016, and 2018.  (Defs' 56.1 ¶ 13; Pl's Resp. 56.1 ¶ 13.)[1]

   As a part of her position, Plaintiff performed various office tasks in addition to her bus driving duties, including "keep[ing] track of the [Department of Transportation] logs" and "conducting safety meetings and trainings."  (Defs' 56.1 ¶ 21; Pl's Resp. 56.1 ¶ 21.)  The Parties agree that at least some of these tasks were performed at the direction of Stephanie Snyder ("Snyder"), who became the General Manager of the Sparrow Bush location in July 2019. (Defs' 56.1 ¶¶ 14, 21; Pl's Resp. 56.1 ¶¶ 14, 21.)  In late 2019, Snyder recommended Plaintiff for a six-day program to become a School Bus Driver Instructor ("SBDI"), which was approved and funded by National Express.  (Defs' 56.1 ¶¶ 23–25; Pl's Resp. 56.1 ¶¶ 23–25.)  Plaintiff

---

[1] Plaintiff states that she took and passed the physical performance test every year while employed by Defendants, not just in the years cited by Defendants. (Pl's Resp. 56.1 ¶ 13.)

completed the program and became certified as an SBDI on December 17, 2019.  (Defs' 56.1 ¶ 27; Pl's Resp. 56.1 ¶ 27.)

### 2.  Plaintiff's 2019 Injury

In March 2019, Plaintiff suffered an injury to her hand, went to the emergency room for initial treatment, and stopped driving her bus route.  (Defs' 56.1 ¶¶ 28–29; Pl's Resp. 56.1 ¶¶ 28–29; *see also* Decl. of Adam Gross in Supp of Mot. ("Gross Decl.") Ex. A ("Pl's Depo."), at 75:8–14 (Dkt. Nos. 51, 51-1).)  On April 2, 2019, Plaintiff's doctor notified Defendants that Plaintiff would return to work on April 3, 2019, but was "unable to operate a motor vehicle until further notice."  (Defs' 56.1 ¶ 30; Pl's Resp. 56.1 ¶ 30; Gross Decl. Ex. H, at 2 (Dkt. No. 51-8).)  On April 3, 2019, Plaintiff called Snyder in order to "shed some light on the process and what [Plaintiff] should do next," to which Snyder provided Plaintiff with an employee's phone number in National Express' Human Resources ("HR") Department.  (Defs' 56.1 ¶¶ 31, 33; Pl's Resp. 56.1 ¶¶ 31, 33.)  After another visit to Plaintiff's doctor on April 23, 2019, the doctor again stated that Plaintiff was "unable to operate a motor vehicle until further notice."  (Defs' 56.1 ¶ 34; Pl's Resp. 56.1 ¶ 34; Gross Decl. Ex. I, at 2 (Dkt. No. 51-9).)  "On May 1, 2019, National Express approved Plaintiff for a Family and Medical Leave Act ("FMLA") leave of absence, retroactive to April 4, 2019, and continuing to July 5, 2019."  (Defs' 56.1 ¶ 35; Pl's Resp. 56.1 ¶ 35; *see also* Gross Decl. Ex. J, at 2 (Dkt. No. 51-10).)

On May 8, 2019, Plaintiff's doctor wrote another letter stating that Plaintiff was "diagnosed with a hand and wrist strain, overuse injury" that was "[o]ccupationally related." (Gross Decl. Ex. K, at 2 (Dkt. No. 51-11); *see also* Defs' 56.1 ¶ 37; Pl's Resp. 56.1 ¶ 37.)  In addition, the doctor stated that Plaintiff "is on restricted office duty for a period of 2 weeks" from the date of the letter, and "[w]hen she returns to bus duty, she must be allowed to wear an appropriate cushioned and padded wrist and hand glove to reduce strain on the wrist and hand

4

and to reduce impact from the air br[ake] on the palm of the hand." (Gross Decl. Ex. K, at 2; Defs' 56.1 ¶ 37; Pl's Resp. 56.1 ¶ 37.) According to Plaintiff, the air brake is "a device that is designed to stop vehicles that are large" similar to an "emergency brake." (Defs' 56.1 ¶ 38; Pl's Resp. 56.1 ¶ 38.) As directed by her doctor, Plaintiff returned to work conducting administrative tasks for Defendants, working the "same hours that [her] bus route would be" at the same pay rate. (Defs' 56.1 ¶¶ 39–40; Pl's Resp. 56.1 ¶¶ 39–40.) On May 15, 2019, Plaintiff's doctor stated that she "c[ould] be released to any job that does not require constant and repetitive pushing and pulling of an air br[ake] with her right hand." (Defs' 56.1 ¶ 41; Pl's Resp. 56.1 ¶ 41; Gross Decl. Ex. L, at 3 (Dkt. No. 51-12).) As such, Plaintiff returned to driving a bus without an air brake for one-to-two weeks, after which Plaintiff was "medically cleared to resume driving a bus with an air brake, with a padded glove to 'help the pressure from the air brake.'" (Defs' 56.1 ¶¶ 42–43; Pl's Resp. 56.1 ¶¶ 42–43.) Plaintiff testified that her disability discrimination claim against Defendants is unrelated to this 2019 injury. (Defs' 56.1 ¶ 44; Pl's Resp. 56.1 ¶ 44.)

### 3. Plaintiff's 2020 Injury

In January 2020, Plaintiff noticed swelling in her previously injured right hand and made an appointment for February 4, 2020 to see her doctor. (Defs' 56.1 ¶ 45; Pl's Resp. 56.1 ¶ 45.) At the appointment, Plaintiff's doctor told her that her injury had worsened, after which Plaintiff called Snyder to convey the news. (Defs' 56.1 ¶¶ 48–49; Pl's Resp. 56.1 ¶¶ 48–49.) The next day, Plaintiff drove her morning bus route. (Defs' 56.1 ¶ 50; Pl's Resp. 56.1 ¶ 50.)

That morning at 9:18AM, Snyder emailed Area Safety Manager Angel Randall ("Randall") and Sparrow Bush Safety Supervisor Ann Ponds ("Ponds") regarding Plaintiff's injury. (Defs' 56.1 ¶ 51; Pl's Resp. 56.1 ¶ 51; Gross Decl. Ex M ("Snyder Email"), at 2 (Dkt. No. 51-13); *see also* Defs' 56.1 ¶¶ 17, 19 (identifying Randall and Ponds); Pl's Resp. 56.1 ¶¶ 17,

19 (same).)  While the Parties agree that Snyder indeed sent this email containing the contents as
described below, Plaintiff disputes the accuracy of certain statements, including whether Plaintiff
indeed said some of the language described in Snyder's email.  (*See* Pl's Resp. 56.1 ¶¶ 52–56.)
In this email, Snyder wrote that she had a call with Plaintiff on February 4, 2020, around 6pm,
where Plaintiff informed Snyder that she went to her doctor regarding her right hand, despite
"[Snyder] and [Ponds] [having not] been informed by [Plaintiff] of any pain or issues to her right
hand."  (Snyder Email at 2.)  Snyder stated that the doctor "didn't give [Plaintiff] any paperwork
stating that she isn't able to perform her regular duties" and cited the fact that Plaintiff was
driving her regular bus route at the time of the email.  (*Id.*; *see also* Defs' 56.1 ¶ 52; Pl's Resp.
56.1 ¶ 52.)  Snyder wrote that Plaintiff "stated the injury to her hand is causing her constant pain
and swelling . . . . [b]ut if needed she can drive another vehicle that doesn't have airbrakes."
(Snyder Email at 2; Defs' 56.1 ¶ 53; Pl's Resp. 56.1 ¶ 53.)  Snyder reported that Plaintiff also
stated that "her doctor is leaving it up to her to decide if she needs to be off work or not" and that
once she decides, "he will write her a letter."  (Snyder Email at 2; Defs' 56.1 ¶ 54; Pl's Resp.
56.1 ¶ 54.)  Plaintiff disputes that she told Snyder that she was experiencing "constant pain and
swelling," and also disputes that she told Snyder that it was "up to her" to decide whether
Plaintiff is able to work.  (Pl's Resp. 56.1 ¶¶ 53–54.)

Snyder continued in her email, expressing her concern "that an injury to [Plaintiff's] hand
isn't limited to one function, it would be [] painful when using to perform any functions."
(Snyder Email at 2; Defs' 56.1 ¶ 55; Pl's Resp. 56.1 ¶ 55.)  Finally, Snyder wrote that "[Plaintiff]
works in the office part time Monday, Wednesday[,] and Fridays to help prepare any safety
meeting or courses" for about "9 to 15 hours" each week, "depending on the workload."  (Snyder

Email at 2; Defs' 56.1 ¶ 56; Pl's Resp. 56.1 ¶ 56.)[2]  At her deposition, Snyder expanded on her

statement that "it would be painful" for Plaintiff "when using [her hand] to perform any

functions" stating that "[i]f there was an emergency and [Plaintiff] had to get off the bus and help

children off the bus, whether it's extending a hand[]out or lifting them, pulling them, dragging

them . . . . [i]ts a requirement that you have to be able to drag a 125-pound weight for 30 feet in

under 30 seconds.  My concern was that with a hand injury you are not going to be able to pull a

child off the bus or assist with that."  (Defs' 56.1 ¶ 57; Pl's Resp. 56.1¶ 57; *see also* Gross Decl.

Ex. B ("Snyder Dep."), at 79:17–80:6 (Dkt. No. 51-2).)  Snyder also testified that her "concern

was [Plaintiff] driving, [Plaintiff] being responsible for students, because that is part of the duties

of a bus driver."  (Defs' 56.1 ¶ 58; Pl's Resp. 56.1 ¶ 58; *see also* Snyder Dep. at 80:14–21.)

Plaintiff disputes Snyder's "intent" in providing the quoted testimony, as well as Snyder's

"genuine[] concern[] with safety" of the students.  (Pl's Resp. 56.1 ¶ 58.)

Later that day on February 5, 2020, Plaintiff emailed Snyder stating that she had "been

waiting for a call back from the doctor" and that the doctor would fax over notes: "[o]ne

explaining the injury and a second stating [Plaintiff] will be out at least a week for treatment."

(Defs' 56.1 ¶ 59; Pl's Resp. 56.1 ¶ 59; Gross Decl. Ex. N, at 2 (Dkt. No. 51-14).)  National

Express received two doctor's notes on February 5 and 6, 2020, explaining Plaintiff's injury.

(*See* Defs' 56.1 ¶ 60–61; Pl's Resp. 56.1 ¶¶ 60–61.)  The first letter dated February 5, 2020,

stated the following:

> [Plaintiff] [h]as a work-related injury including tendinitis of the wrist and forearm
> as well as the hand.  This condition persisted over the summer and, although
> initially imputed considerably with workplace modifications, it has returned and is
> unresponsive to those same modifications at this time.  The patient is unable to use
> the air br[ake]] device as described in her typical [] occupation vehicle.  An

---

[2] Plaintiff disputes the content of this statement, stating that she worked in the office
every day.  (Pl's Resp. 56.1 ¶ 56.)

appropriate modification would be moving her to a role where she does not need to operate these hand powered air breaks [sic].  She has a 33% temporary disability secondary to this hand/upper extremity injury.

(Defs' 56.1 ¶ 60; Pl's Resp. 56.1 ¶ 60; *see also* Gross Decl. Ex. O at 2 (Dkt. No. 51-15).)  The second letter, dated February 5, 2020, but received February 6, 2020, stated: "Please excuse [Plaintiff] from work for 1 week (2/12/2020) due to her work related injury.  She will continue to be reevaluated for further treatment."  (Defs' 56.1 ¶ 61; Pl's Resp. 56.1 ¶ 61; *see also* Gross Decl. Ex. P, at 2 (Dkt. No. 51-16).)

### 4.  Plaintiff's Modified Work Duty

On February 7, 2020, Plaintiff met with Snyder and Ponds who provided Plaintiff with two forms to fill out regarding the nature of her injury: a "Supervisor's Report of Work Injury & Employee Injury Prevention" as well as an "Employee's Report of Work Injury."  (Defs' 56.1 ¶ 62; Pl's Resp. 56.1 ¶ 62; *see also* Gross Decl. Ex. Q, at 2 (Dkt. No. 51-17); *id*. Ex. R, at 2 (Dkt. No. 51-18).)  Around noon that day after the meeting, Plaintiff emailed Snyder stating that "[t]his paperwork appears to be something that you guys need to fill out."  (Defs' 56.1 ¶ 65; Pl's Resp. 56.1 ¶ 65; *see also* Gross Decl. Ex. S, at 3 (Dkt. No. 51-19).)  Plaintiff continued, stating: "After speaking with you in person[,] you told me there wasn't any position that could be offered to me. Now after reading this form[,] it states that there is modified work for me, so what does that include (hours, time, pay, etc.)[?]  Once you fill out your portion[,] I can clear it with my doctor. This way we are all covered."  (Defs' 56.1 ¶ 65; Pl's Resp. 56.1 ¶ 65; *see also* Gross Decl. Ex. S, at 3.)  Snyder replied shortly thereafter, clarifying that she "didn't say there wasn't a position here for you," instead referencing Plaintiff's last injury when she was placed on "light duty." (Defs' 56.1 ¶ 66; Pl's Resp. 56.1 ¶ 66; *see also* Gross Decl. Ex. S, at 2.)  Snyder then indicated that, while Plaintiff was out this week due to her doctor's orders, Defendants "will use [Plaintiff] on light duty for the 30 hour course for the entire month of February [starting on February 15]."

8

(Defs' 56.1 ¶ 66; Pl's Resp. 56.1 ¶ 66; *see also* Gross Decl. Ex. S, at 2.)  Plaintiff responded, asking whether Defendants would give Plaintiff any additional work beyond the course, noting that her "doctor ha[d] not stated anything about light duty other than the restriction of repetitive air brake use."  (Gross Decl. Ex. S, at 2.)

"On February 11, 2020, Plaintiff's doctor faxed a note to National Express extending Plaintiff's absence from work from February 12, 2020, to February 17, 2020."  (Defs' 56.1 ¶ 69; Pl's Resp. 56.1 ¶ 69; *see also* Gross Decl. Ex. T, at 3 (Dkt. No. 51-20).)  Plaintiff also emailed Snyder twice that same day to cancel the 30-hour course Plaintiff was scheduled to teach, as well as to circulate a draft letter to send to the parents and students of her bus route.  (Defs' 56.1 ¶¶ 70–71; Pl's Resp. 56.1 ¶¶ 70–71.)  The letter stated, in part: "It is with a heavy heart that I send this letter out to all of you.  As most of you may know, I suffered an injury to my hand last year.  Sadly, this year that injury will prevent me from returning as your bus driver."  (Defs' 56.1 ¶ 72; Pl's Resp. 56.1 ¶ 72; Gross Decl. Ex. W, at 2 (Dkt. No. 51-23).)

On February 13, 2020, Plaintiff's doctor faxed Defendants a "Physical Capacities Evaluation" form, (Defs' 56.1 ¶ 73; Pl's Resp. 56.1 ¶ 73), which is used "to make some determinations regarding [Plaintiff's] ability to perform work-related activities,"  ((Gross Decl. Ex. X, at 2 (Dkt. No. 51-24)).  On this form, Plaintiff's doctor indicated that she could "[l]ift 15 lbs. occasionally," occasionally "[c]limb ladders" perform "[s]imple grasping," and "[f]ine manipulation," and noted that Plaintiff was able to drive vehicles with the special instruction of "no air brake – continuous."  (Gross Decl. Ex. X, at 2; Defs' 56.1 ¶¶ 74–76; Pl's Resp. 56.1 ¶¶ 74–76.)  On the same day, Plaintiff emailed Snyder to confirm Defendants' receipt of the form, and asking what duties she would be performing when she returned from her leave of absence on February 17, 2020.  (Defs' 56.1 ¶ 78; Pl's Resp. 56.1 ¶ 78; Gross Decl. Ex. Y, at 2

(Dkt. No. 51-25).)  Snyder responded, copying Ponds and two other executives, confirming

receipt of the doctor's note and stating that there were "a few issues in regards to the physical

capacit[ies] evaluation form[] that we need clarification on" and that the paperwork was

submitted to the Safety Area Director and claims adjustor.  (Defs' 56.1 ¶¶ 79–80; Pl's Resp. 56.1

¶¶ 79–80; Gross Decl. Ex Y, at 2.)  At the same time, Ponds sent the document to Randall,

asking for "clarification on what we should avoid on the light duty list since the doctor gave

some specifics that [Plaintiff] is limited to," and noted that she was "not comfortable with

[Plaintiff's] claim on constant pain in her hand and returning to light duty."  (Defs' 56.1 ¶ 81;

Pl's Resp. 56.1 ¶ 81; Gross Decl. Ex. Z, at 2 (Dkt. No. 51-26).)  Randall responded shortly

thereafter, directing Ponds to discuss the situation with another employee, and stating that the

"[r]ule of thumb [is to] always go by the restrictions of the most recent updated doctor[']s note[,]

not by the employee's complaints."  (Defs' 56.1 ¶ 84; Pl's Resp. 56.1 ¶ 84; Gross Decl. Ex. AA,

at 2 (Dkt. No. 51–27).)

On February 17, 2020, Plaintiff sent several emails to Snyder asking whether she would

be working the following day.  (*See* Defs' 56.1 ¶¶ 98–101; Pl's Resp. 56.1 ¶¶ 98–101; Gross

Decl. Ex. Y, at 3–5.)  In response to one of the emails, Snyder reiterated that she and Ponds were

awaiting further guidance and that, "after clarification tomorrow morning, [Snyder] or [Ponds]

will reach out to [Plaintiff]" and it was "very possible" that Plaintiff would work return to work

the next day.  (Defs' 56.1 ¶ 101; Pl's Resp. 56.1 ¶ 101; Gross Decl. Ex. Y, at 4.)  On February

18, 2020, Plaintiff returned to work and met with Snyder and Ponds, who gave Plaintiff a

completed "Modified Work Letter" ("MWL").  (Defs' 56.1 ¶¶ 102–05; Pl's Resp. 56.1 ¶¶ 102–

05; Gross Decl, Ex. CC ("MWL") (Dkt. No. 51-29).)  The MWL stated, in relevant part:

> With regard to your work-related injury occurring on or about the date of
> 3/28/2019, the treating physician has recommended medical restriction(s) to

preserve your health.  Attached is a work status form dated 2/4/2020 by the doctor identifying the restriction(s).[3]  This letter is to advise you that this employer does have modified work available that complies with the medical restriction(s).  As we understand that this modified work position may be new to you, we will only assign tasks consistent with your work abilities (as outlined by your doctor), knowledge and skills.  We will provide training if necessary for the offered position.

Modified Work available will involve the following tasks and physical requirements: Clean break room, [c]lean bathrooms, small painting projects, wash windows in CSC, wash bus windows, sweep buses, secondary child check, flagging drivers as they enter the lot, spray paint areas of concern for safety notification, pick up trash around the location, confirm that drivers are doing pre/post trip logs, check buses to make sure proper insurance cards are in vehicles, ensure proper pre/post trip paperwork is completed properly[.]

(MWL at 2; Defs' 56.1 ¶¶ 104–05; Pl's Resp. 56.1 ¶¶ 104–05.)  The MWL also stated that Plaintiff would be paid $19.15—the same rate of pay Plaintiff received while driving buses—and that Plaintiff's schedule would be "Monday through Friday, 2pm to 7pm with a 15-minute break."  (Defs' 56.1 ¶¶ 110–11; Pl's Resp. 56.1 ¶¶ 110–11; MWL at 2–3.)  Plaintiff signed the MWL on February 18, 2020, checking the box that stated "I hereby accept this modified work assignment."  (Defs' 56.1 ¶ 112; Pl's Resp. 56.1 ¶ 112; MWL at 3.)

On February 19, 2020, Plaintiff reported to her assigned location for her first day of modified work.  (Defs' 56.1 ¶ 115; Pl's Resp. 56.1 ¶ 115.)  Though the Parties dispute who actually assigned Plaintiff work that day, (see Defs' 56.1 ¶ 116; Pl's Resp. 56.1 ¶ 116), Plaintiff completed her assigned tasks of sweeping the parking lot and checking the buses for "child check signs," (Defs' 56.1 ¶ 117; Pl's Resp. 56.1 ¶ 117).  Plaintiff went home after completing

---

[3] Plaintiff disputes the representation that the Physical Capacities Form was attached to this letter or provided to her at the same time as the Modified Work Letter.  (See Pl's Resp. 56.1 ¶ 104.)

those two tasks.  (Defs' 56.1 ¶ 120.)[4]  Plaintiff reported to the same location the next day at 2:00

PM, where she was given a work schedule with the following tasks:

> 2:10 pm – 3:10 pm: Lot sweeping (on poor weather days a different task will be assigned)
>
> 3:15 pm – 4:30 pm: Check buses as they enter the lot to do a child check & observe if the unit is DOT ready at that time
>
> 4:30 pm – 4:45 pm: **BREAK**
>
> 4:45 pm – 5:15 pm: Check buses as they enter the lot to do a child check & observe if the unit is DOT ready at that time
>
> 5:15 pm – 6:00 pm: Sweeping buses, cleaning windows, cleaning carseats [sic], checking buses for out of date paperwork (i[.]e. Registration & Insurance)

(Defs' 56.1 ¶¶ 121–22; Pl's Resp. 56.1 ¶¶ 121–22; Gross Decl. Ex. DD, at 2 (Dkt. No. 51-30).)

Plaintiff completed the first task (i.e. lot sweeping), however Plaintiff was unable to access the

buses for her next assigned task (i.e. checking the buses and reporting whether they were "DOT

ready").  (*See* Defs' 56.1 ¶¶ 124–26; Pl's Resp. 56.1 ¶¶ 124–26.)  Plaintiff went to the main

office at the site and told an individual that she was "experiencing extreme pain."  (Defs' 56.1

¶¶ 126–27; Pl's Resp. 56.1 ¶ 126–27.)  Plaintiff then went home.  (*See* Defs' 56.1 ¶ 128; Pl's

Resp. 56.1 ¶ 128.)[5]

---

[4] Plaintiff disputes Defendants' statement, however, Plaintiff's dispute is purely semantic in nature.  (*See* Pl's Resp. 56.1 ¶ 120.)  As it is undisputed that Plaintiff did indeed go home after completing the assigned tasks, the Court will deem this fact admitted.  *See Arch Specialty Ins. Co. v. TDL Restoration, Inc.*, No. 18-CV-6712, 2021 WL 1225447, at *1 n.1 (S.D.N.Y. Mar. 31, 2021) (collecting cases) ("Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, [the Court will not consider] these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, . . . as creating disputes of fact.").

[5] Plaintiff disputes that she "was told she could go home" rather being "sent" home by Defendants.  (*See* Defs' 56.1 ¶ 128; Pl's Resp. 56.1 ¶ 128.)  However, it appears undisputed that Plaintiff did indeed "go home" after this conversation.

At 5:43 PM that evening, Plaintiff sent Snyder, Ponds, and other executives an email outlining what occurred that day on site.  (Defs' 56.1 ¶ 129; Pl's Resp. 56.1 ¶ 129; *see also* Gross Decl. Ex. EE, at 2 (Dkt. No. 51-31).)  The email stated, in relevant part:

> Today I reported to [the worksite] at 2pm and was handed the daily schedule which stated that from 2:10pm to 3:10pm I was to sweep the lot.  I did this . . . and then headed inside at approximately 3pm to get a check list for what I was checking the buses for in the lot.  Dispatch did not have one and when I went out into the lot I discovered that I could not access the bus.  At this point I was experiencing extremely severe pain in my injured arm.  I went in, as per [Snyder's] request to communicate more, and spoke to the girls in dispatch (I don't know their names).  I told them that I could not get in the buses.  The one girl told me that I could open the passenger door without a key.  I said ok, turned to leave[,] and mentioned to them that I was experiencing severe[] pain.  They told me to go home at 3:13pm.

> [ . . . ] I went to my doctors and they have taken me out until 4/30/2020.  With the expectation of completeing [sic] physical therapy in that time (which is being held up by waiting for the workers compensation approval).  The note is being faxed to [Defendants].  The pain is now worse, due to the nature of the modified work that was assigned to me by Stephanie Snyder.

> With that being said, I would like to file the paperwork for FMLA.

(Defs' 56.1 ¶ 129; Pl's Resp. 56.1 ¶ 129; Gross Decl. Ex. EE, at 2.)

On February 24, 2020, Plaintiff sent an email to Brett Wester, the regional general manager responsible for supervising Snyder as the general manager of the Sparrow Bush location.  (*See* Defs' 56.1 ¶¶ 14, 20, 133; Pl's Resp. 56.1 ¶¶ 14, 20, 133.)  In this email, Plaintiff stated, among several other things: "I envisioned a day where I wouldn't have the strength in my arm to pull the air brake anymore, a day where my students' lives could have been in danger because I ignored my doctor's orders.  Even though I had to risk everything—I couldn't risk the safety of my passengers . . . ."  (Defs' 56.1 ¶ 134; Pl's Resp. 56.1 ¶ 134; Gross Decl. Ex. FF, at 3 (Dkt. No. 51-32).)  Plaintiff has remained employed by National Express but has not performed any work for National Express since February 20, 2020.  (Defs' 56.1 ¶ 135; Pl's Resp. 56.1 ¶ 135.)

B.  Procedural History

Plaintiff filed her initial Complaint on or about July 7, 2021.  (*See* Compl.)[6]  Defendants

filed an answer to the Complaint on September 7, 2021.  (Dkt. No. 11.)  After completing

discovery, Defendants filed a pre-motion letter in anticipation of filing a motion for summary

judgment on June 13, 2022.  (Dkt. No. 40.)  After receiving Plaintiff's response, (Dkt. No. 41),

the Court held a pre-motion conference on July 27, 2022 and adopted a briefing schedule, (*see*

Dkt. (minute entry for July 27, 2022); Order (Dkt. No. 44)).

On September 7, 2022, Defendants filed the instant Motion.  (*See* Not. of Mot.; Defs'

56.1; Mem. of Law in Supp. of Mot. ("Defs' Mem.") (Dkt. No. 50); Gross Decl.)[7]  Plaintiff filed

her Opposition on October 7, 2022.  (*See* Mem. of Law in Opp. to Mot. ("Pl's Opp.") (Dkt.

No. 56); Pl's Resp. 56.1; Decl. of Brian Heller in Opp. of Mot. (Dkt. No. 52); Decl. of Elizabeth

Sullivan in Opp. of Mot. ("Sullivan Decl.") (Dkt. No. 54); Decl. of Kelly Sullivan in Opp. of

Mot. (Dkt. No. 55).)  On October 21, 2022, Defendants filed their Reply.  (*See* Reply Mem. in

Supp. of Mot. ("Defs' Reply") (Dkt. No. 59).)  After requesting leave of the Court, (*see* Dkt.

Nos. 61, 64), both Parties filed sur-replies on October 25 and 27, 2022.  (Pl's Sur-Reply in Opp.

to Mot. ("Pl's Sur-Reply") (Dkt. No. 62); Defs' Sur-Sur-Reply in Supp. of Mot. ("Defs' Sur-

Reply") (Dkt. No. 65).)

---

[6] Plaintiff filed a Complaint on July 6, 2021, but refiled on July 7, 2021 due to a clerical error.  (*See generally* Dkt.)

[7] Defendants filed their Motion on September 7, 2022, but refiled the Motion on September 8, 2022 due to a clerical error.  (*See* Dkt. Nos. 45–51.)  For the purpose of the instant Motion, the Court refers to the refiled documents on September 8, 2022.

<u>II.  Discussion</u>

<u>A.  Standard of Review</u>

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to award summary judgment, the [C]ourt must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 355 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Insurance Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014)

15

(quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading.").  And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity*,

51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at \*5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge.").

B.  Analysis

Plaintiff brings two causes of action, alleging that Defendants violated the NYSHRL by discriminating against Plaintiff because of her disability, and failing to provide Plaintiff with a reasonable accommodation for said disability.  (*See* Compl. ¶¶ 48–64.)  Defendants seek summary judgment on all of Plaintiff's claims, arguing that: (1) Defendants were not obligated to accommodate Plaintiff's disability because she was unable to perform an essential job function, (*see* Defs' Mem. 8–14), (2) Defendants did indeed reasonably accommodate Plaintiff and otherwise had legitimate, non-discriminatory reasons for their actions, (*see id*. at 14–18), (3) Plaintiff's discrimination claim is improper because it is duplicative of the failure to accommodate claim and Plaintiff does not allege an adverse employment action, (*see id*. at 18–19), (4) Plaintiff cannot otherwise establish an inference of discrimination and Defendants had legitimate, non-discriminatory reasons for their actions, (*see id*. at 19–22), and (5) summary judgment should be granted as to Plaintiff's damages as back and front pay damages are unavailable and the exclusivity provision of the Worker's Compensation Law bars recovery (*see id*. at 22–25).

The Court will address each argument to the extent necessary to resolve the instant Motion.

1.  Failure to Accommodate Claim

A defendant violates the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless

such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A).  Under the NYSHRL, the term disability "means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques . . . "  N.Y. Exec. Law § 292(21). "Claims under the NYSHRL for a failure to accommodate are governed by the same legal standards as federal ADA claims."  *McKenna v. Santander Inv. Sec. Inc.*, No. 21-CV-941, 2022 WL 2986588, *7 (S.D.N.Y. July 28, 2022).

"Claims alleging disability discrimination in violation of the ADA [or the NYSHRL] are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas*."  *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)).  As such, "[t]o establish a prima facie case for failure to provide a reasonable accommodation, the plaintiff must establish: (1) her employer is subject to the [NYSHRL]; (2) she was disabled within the meaning of the [NYSHRL]; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the employer refused to make such accommodations."  *McKenna*, 2022 WL 2986588, at *7 (underline omitted) (citing *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020)).  "Once [the] plaintiff [has] satisfied his burden of 'production and persuasion as to the existence of an accommodation that is facially reasonable,' the burden 'shifts to the defendant to rebut the reasonableness of the proposed accommodation,' which 'is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship.'"  *Frilando v.*

*N.Y.C. Transit Auth.*, 463 F. Supp. 3d 501, 514 (S.D.N.Y. 2020) (quoting *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016)).

Defendants appear to concede—or at least do not contest for purposes of their Motion— that (1) Defendants are subject to the NYSHRL, and (2) Plaintiff is a person with a disability under the meaning of the NYSHRL.  (*See generally* Defs.' Mem.)  However, Defendants argue that Plaintiff cannot establish a prima facie case of failure-to-accommodate under the NYSHRL because the record evidence demonstrates that Defendants were not obligated to accommodate Plaintiff because she was unable to perform an essential function of her job.  (*See* Defs.' Mem. 8–13.)

In a failure to accommodate claim, "[t]he plaintiff bears the burden of showing that 'the accommodation exists that permits her to perform the job's essential functions.'"  *Schneider v. Wal-Mart Stores, Inc.*, No. 16-CV-2010, 2019 WL 294309, at *6 (S.D.N.Y. Jan. 23, 2019) (quoting *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)).  "If the plaintiff satisfies this burden, the defendant has the burden of proving that the proposed accommodation is not reasonable."  *Id.*  "An employee is qualified for a position only if she can perform its essential functions."  *McBride*, 583 F.3d at 98.  While the ADA does not define the term "essential functions," the EEOC has promulgated regulations that indicate the term "encompasses 'the fundamental job duties of the employment position.'"  *Id.* (quoting 29 C.F.R. § 1630.2(n)(1)).  And, as before, a "qualified individual" under the NYSHRL is "interpreted coextensively" with the ADA.  *Williams v. MTA Bus Co.*, 44 F.4th 115, 124 (2d Cir. 2022). Ultimately, whether a given task "constitutes an essential function depends on the totality of the circumstances."  *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004).

Evidence of whether a particular duty is an essential function under the ADA or NYSHRL may include:

> (i) The employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the incumbent to perform the function; (v) [t]he terms of a collective bargaining agreement; (vi) [t]he work experience of past incumbents in the job; and/or (vii) [t]he current work experience of incumbents in similar jobs.

*Lavender v. Verizon N.Y. Inc.*, No. 17-CV-6687, 2023 WL 1863245, at *16 (E.D.N.Y. Feb. 9, 2023) (quoting *Jones v. N.Y.C. Transit Auth.*, 838 F. App'x 642, 645 (2d Cir. 2021) (summary order) and citing 29 C.F.R. § 1630.2(n)(3)).  "The inquiry into whether a particular function is essential for any given position is a fact intensive one."  *Id.* (citing *Hunt-Watts v. Nassau Health Care Corp.*, 43 F. Supp. 3d 119, 127 (E.D.N.Y. 2014)).  Nevertheless, "[a] court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position."  *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (citing *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998)).

Here, there are numerous questions of fact that, when construing the evidence in the light most favorable to the non-moving party, preclude Defendants' request for summary judgment. For example, the Parties vigorously dispute whether "the ability to lift and assist students when necessary" is an essential job function.  (*See* Defs' Mem. 8–9; 16.)  The job description in question requires several skills to carry out the position's function, which was to "provide safe and reliable transportation service by operating various school buses in transporting pupils to and from school as well as related activities," including the ability to "lift and assist students when

necessary."  (Defs' 56.1 ¶¶ 5–6; Pl's Resp. 56.1 ¶¶ 5–6; *see also* Gross Decl. Ex. D ("Job

Desc."), at 2 (Dkt. No. 51-4).)[8]

Defendants argue that Plaintiff has failed to "establish that, given her disability, she was

nevertheless able to perform he essential functions of her job with or without reasonable

accommodation" because "Plaintiff does not, and cannot, identify any accommodation that

would have enabled her to be able to lift children, some of whom were high-school aged, given

her 15-pound lifting restriction" imposed by her doctor.  (Defs' Mem. 8–9; 16.)  However, the

Court notes that there is another question of fact as to whether the ability to "lift" is an essential

function to the position *at all* given the rarity of this emergency, and Plaintiff's related arguments

as to alternatives to Plaintiff physically lifting students in such an emergency.  (*See* Pl's Opp.

13.)  While "a court must give considerable deference to an employer's judgment regarding what

functions are essential for service in a particular position, particularly when it involves issues of

workplace safety[,]" *Atkins v. Walmart, Inc.*, No. 20-CV-1217, 2022 WL 1320300, at *18

(N.D.N.Y. May 2, 2022) (quotation marks omitted), the Court cannot grant summary judgment

given these questions of fact.

---

[8] While Plaintiff does not dispute that the job description produced in litigation contains
these statements, Plaintiff notes that she "never saw that document until this litigation."  (Pl's
Resp. 56.1 ¶ 5.)  To the extent that Plaintiff is lodging a dispute to this document, the ADA
states, with respect to the term "qualified individual" that "consideration shall be given to the
employer's judgment as to what functions of a job are essential, and if an employer has prepared
a written description before advertising or interviewing applicants for the job, this description
shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8).
Plaintiff's awareness of the document is immaterial to this Court's review, and the record
does not argue that this job description was prepared after she was hired.  In any event, the Court
will consider the job description as evidence of Defendants' judgment as to the essential
functions of the school bus driver position.  *See Flieger v. E. Suffolk Boces*, No. 13-CV-6282,
2016 WL 3527519, at *13 n.10 (E.D.N.Y. June 23, 2016).

Moreover, Plaintiff argues that, in the event that this is an essential job function, she could evacuate children in an emergency by dragging them out of the bus with her left hand, a task that is tested annually in a required physical performance test.  (Pl's Op. 13; *see also* Pl's Depo. at 64:22–65:17; 66:4–11 (stating that Plaintiff "would be able to, with [her] left hand, drag any student"); Defs' 56.1 ¶¶ 12–13 (requiring Plaintiff to "drag 125 pounds over a distance of 30 feet in 30 seconds or less" in the physical performance test and noting that Plaintiff passed the test in 2014, 2016, and 2018); Pl's Resp. 56.1 ¶¶ 12–13 (same).)  Accordingly, Plaintiff argues that, in reality, Defendants tested the ability to "lift and assist" students by whether the drivers could pass this physical test, not by any other measure that would indicate the importance of "lifting" in particular.  Indeed, examining the records from Plaintiff's previous physical performance tests, if a driver is able to pass all seven standards (including the ability to drag the requisite weight), the driver "is qualified by the physical performance standards" of New York State.  (Gross Decl. Ex. E, at 2.)  Defendants have offered no evidence to counter Plaintiff's assertions that potential essential physical functions of the job are *only* tested through the annual physical performance test.  Resolving all inferences in Plaintiff's favor, as the Court must at this stage, there is a genuine issue of material fact as to whether Plaintiff could indeed perform the specific ability to "lift," as tested through the annual physical test.

In addition, Plaintiff argues that Defendants did not provide her with a reasonable accommodation, instead providing two accommodations that were either exploitative or outside of Plaintiff's physical capabilities.  (*See* Pl's Opp. 5–8.)  Specifically, Plaintiff cites the first offer for Plaintiff to teach the 30 hour course for new bus drivers, noting that "[a]ll Snyder wanted to do was to use [Plaintiff] for her SBDI certification" and that the 10 hours per week of the class "was a significant reduction from the 50-60 hours that [Plaintiff] had been working per week."

(*Id*. at 6.)  Second, Plaintiff states that her assigned modified work "listed physical labor far more strenuous than anything [Plaintiff] had done prior" and was "particularly difficult since [Plaintiff] had injured her dominant hand."  (*Id*. at 6–7.)  Third and finally, Plaintiff questions whether "light duty" work was actually available contrary to statements by Defendants at the time, and alleges that Snyder told her that she would be assigned light duty prior to her modified work assignment.  (*Id*.)

Although it is true that the "reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder, . . . in a case . . . in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'"  *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996)).  An accommodation is reasonable if it "enable[s] an individual with a disability who is qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities."  29 C.F.R. § 1630.2(o)(1)(ii), (iii).  "In the context of the ADA, reasonable accommodation may include, inter alia, modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, 'reassignment to a vacant position.'"  *McBride*, 583 F.3d at 97 (italics omitted) (quoting 42 U.S.C. § 12111(9)(B)).  However, "the ADA does not require employers to provide employees with the particular accommodation the employee requests 'so long as the accommodation provided is reasonable.'"  *Caruso v. Camilleri*, No. 04-CV-167, 2008 WL 170321, at *23 (W.D.N.Y. Jan. 15, 2008) (quoting *Fink v. N.Y.C. Dep't of Personnel*, 53 F.3d

565, 567 (2d Cir. 1995)).  "Reasonable accommodation may take many forms, but it must be effective."  *Noll*, 787 F.3d at 95.

Here too, the Court finds that there are several issues of fact precluding summary judgment at this time.  For example, while Plaintiff's doctor indicated that she could "lift 15 lbs. occasionally," occasionally "climb ladders," and perform "simple grasping" and "fine manipulation," (*see* Gross Decl. Ex. X, at 2; Defs' 56.1 ¶¶ 74–76; Pl's Resp. 56.1 ¶¶ 74–76), there is a question of fact as to whether Defendants' modified tasks that involved Plaintiff sweeping large parking lots fit within her abilities, (*see* Pl's Opp. 6–7; Sullivan Decl. ¶ 75 (stating that Defendants "sent" her to perform physical labor that they "knew or should have known [she] could not perform with an arm injury" and citing Plaintiff's deposition testimony as evidence); *see also* MWL at 2 (identifying modified work schedule) ; Defs' 56.1 ¶¶ 104–05 (same); Pl's Resp. 56.1 ¶¶ 104–05 (same).)  Moreover, while "employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee," *Noll*, 787 F.3d at 95 (citing 29 C.F.R. § 1630 app. ("[Although] the preference of the individual with a disability should be given primary consideration[,] . . . the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.")), it does appear that there are several activities that Defendants could have offered Plaintiff that better fit her abilities, such as driving a bus without an air brake or light duty office work.

Finally, Plaintiff argues that Defendants failed to engage in a good faith interactive process as required under both the ADA and NYSHRL prior to proposing accommodations for Plaintiff.  (*See* Pl's Opp. 8–9.)  Indeed, Defendants presented Plaintiff with a proposed

accommodation—i.e., the MWL—and Plaintiff accepted the assignment.  (*See* Defs' 56.1 ¶ 112; Pl's Resp. 56.1 ¶ 112; MWL at 3 (checking the box that stated "I hereby accept this modified work assignment").)  Several courts have found that, if a Plaintiff accepts an accommodation, Defendants cannot be held liable for an alleged failure to continue a closed dialogue.  *See, e.g.*, *Wall v. Charter Comm's, Inc.*, No. 19-CV-6387, 2022 WL 4095840, at *8 (W.D.N.Y. Sept. 7, 2022) (collecting cases); *Atkins*, 2022 WL 1320300, at *17 ("An employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate." (quoting *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 946 (2d Cir. 2008) (summary order))); *Elmessaudi v. Mark 2 Restaurant LLC*, No. 14-CV-4560, 2016 WL 4992582, at *8 (S.D.N.Y. Sept. 15, 2016) ("If—as the [p]laintiff now claims—the adjusted schedule was an insufficient accommodation, he could and should have continued engaging in the interactive process . . . .  Having accepted the accommodation that [the] [d]efendant provided without complaint, [the] [p]laintiff may not now complain that the accommodation was inadequate.").  However, Plaintiff in response argues that she signed the letter because she was "terrified she was going to be fired," noting that "Snyder coldly told [Plaintiff] that if she did not agree to these tasks . . . she would not receive worker's compensation or any benefits."  (Pl's Opp. 7.)  The Court's task "[i]n evaluating a claim for failure to accommodate . . . [is] to isolate the cause of the breakdown [of the interactive process] and then assign responsibility," because "[a]n employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate."  *Atkins*, 2022 WL 1320300, at *17 (first citing *Boughton v. Town of Bethlehem*, No. 13-CV-01583, 2015 WL 5306077, at *9, (N.D.N.Y. Sept. 10, 2015), then citing *Nugent*, 303 F. App'x at 946)).  This issue of fact alone renders the Court incapable of determining where the breakdown of the interactive process occurred.

Accordingly, Defendants' motion for summary judgment on Plaintiff's failure to accommodate claim is denied.

## 2.  Disability Discrimination Claim

Defendants also seek summary judgment on Plaintiff's disability discrimination claim under the NYSHRL.  (*See* Defs' Mem. 18–22.)  "To establish a prima facie case of disability discrimination under the ADA or NYSHRL, a plaintiff must show that (1) the defendant is a covered employer; (2) the plaintiff suffered from, or was regarded as suffering from, a disability within the meaning of the statute; (3) the plaintiff was qualified to perform the essential functions of the job, with or without a reasonable accommodation; and (4) she suffered an adverse employment action because of her disability or perceived disability." *Dobbs v. NYU Langone Medical Ctr.*, No. 18-CV-1285, 2021 WL 1177767, at *5 (S.D.N.Y. Mar. 29, 2021) (citing *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019); and *Jacobs v. New York City Dep't of Educ.*, 768 F. App'x 86, 87 (2d Cir. 2019) (summary order)).

Here, Defendants' arguments fail for similar reasons as previously addressed in relation to the failure to accommodate claim.  There are numerous questions of fact as to the essential functions of the job, whether Plaintiff could perform them, and whether Defendants' accommodation was indeed reasonable.

Accordingly, Defendants' motion for summary judgment on Plaintiff's disability claim is denied.

## III.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is denied.  The Clerk of Court is directed to terminate the pending motion at Dkt. No. 48.  The Court will hold a status conference on October 10, 2023 at 3:30 PM.

SO ORDERED.

Dated:    September 26, 2023
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge